**INDIANAPOLIS (City) v DOMHOFF &
JOYCE COMPANY et**

Ohio Appeals, 1st Dist, Hamilton Co

No 5851. Decided Jan 6, 1941

234

Gilbert Bettman, Cincinnati, for appellant.

Peck, Shaffer, Williams & Gorman, Cincinnati, for appellees.

## OPINION

By MATTHEWS, J.

For the purpose of exposing and emphasizing the conflicting views of the issues presented by this record, counsel have by close analysis developed four issues. We believe that they can be consolidated into two issues for the purpose of disclosing the reasons on which we have proceeded in arriving at our conclusion. These two issues are:

(1) Was the certification and subsequent cashing of this check tendered in full satisfaction an accord and satisfaction under the circumstances?

(2) Was the defendant-appellee debarred from availing itself of the defense of accord and satisfaction by the circumstance of the contractual relation binding it to the plaintiff-appellant?

The record shows that the relation between the appellee and the appellant's assignor began in 1908. It related to the disposition of coke produced by the appellant's assignor as a by-product to the production of gas from coal. The appellee was the instrumentality through which the coke was marketed. The contracts were usually for a period of five years. The last contract was entered into on July 5th, 1933, to cover a period commencing March 1st, 1934, and ending February 28th, 1939. In this contract the parties stated their anticipation that appellant would become the successor to the contracting party producing the coke and the assignee of its rights under this contract. The appellee agreed that this assign-

ment could be made, and, so, the issues can be disposed of as though the appellant was one of the original contracting parties. The appellant, therefore, can be treated as the party of the first part in the contract and the appellees as the party of the second part. By this contract, it is recited that the party of the first part "has constituted and appointed and does hereby constitute and appoint the party of the second part its exclusive sales agent to ·dispose of all coke by it produced in its by-product ovens at the City of Indianapolis, which is not required by the first party for its own use." There are provisions requiring the party of the the second part to establish and maintain an office in the City of Indianapolis, to advertise the coke, to employ an adequate number of competent salesmen, and if deemed advisable by the first party, to employ a competent demonstrator acceptable to first party, to demonstrate to consumers the use of the coke.

It was mutually agreed that while the party of the second part was not excluded from selling coke manufactured by others, the second party covenanted to actively exert itself to establish a wide market for first party's coke especially in Indianapolis and contiguous territory and territory in which it had been customary to market first party's coke, and, to secure the best possible price, and, wherever possible to give preference to first party's coke, and that all sales both as to price and proposed purchaser should be subject to approval of first party.

It was also provided that the second party should "remit to the first party on or before the 20th day of each month for all shipments made during the previous month as to which there has been no dispute as to shipment, price or quality, and shall guarantee the party of the first part against losses by reason of bad accounts on all sales by said party of the second part".

It was also provided that all adjustments should be referred to the first party and no abatements made without its consent, and that upon adjustment remittance should be made, and that in event second party should have remitted before adjustment it was authorized to deduct a sum equal to the abatement from subsequent remittances.

It was also provided that it was the duty of second party to furnish the first party with orders for its entire output, and that should it fail in this, the first party should have the right to sell the unsold portion by other means, not, however, at a lower price, but this right should end ·when the second party should furnish orders for current delivery sufficient to take the entire output plus any accumulated stock.

The first party agreed "to allow and pay" the second party a commission of five per centum of the price of all coke sold by it f. o. b. cars at first party's ovens except on sales to blast furnaces and sales of domestic coke for delivery and consumption in Indianapolis, upon which it was to receive a commission of twenty cents per ton. The second party was authorized to deduct its commission when making its monthly remittances.

That is a summary of all the terms of the contract that are in any way material.

It will be observed that this is a contract that bound the appellant to give the appellee the first chance as its agent to dispose of the entire output of coke at its gas ovens upon certain terms and conditions. If it failed to dispose of the entire output after using reasonable efforts so to do, the appellant had the right to market through other channels that coke which the appellee had been unable to market.

It will also be observed that appellant did not agree to produce any particular quantity of coke. The limit of its obligation in that respect was that so long as it produced coke at its plant, it would give the appellee the first opportunity to sell it. 12 Am Jur. 561. It could have stopped producing coke at any time without incurring any liability to the appellee.

It will further be noted that the appellant did not obligate itself to pro-

duce any particular type or grade of coke, for so long as it produced any type or grade during the five year period, its contract required it to give the appellee the first chance to dispose of it.

It is apparent also that in the monthly accounting the appellee was authorized to deduct its commissions and was not required to account or pay for those items concerning which disputes had arisen as to shipments, price, or quality until the dispute had been settled. The contract contains no other provision for omissions or deductions or credits in the monthly accounts of the appellee.

The parties operated under this contract for five years, and considering the number and magnitude of the transactions there were comparatively few disputes. The appellee received payment for the coke from the customers, deposited the money to its credit in its bank and accounted monthly for the proceeds of all undisputed sales and remitted by its check for the balance due after deducting commissions. The appellee, as the appellant's agent, undoubtedly owed the duty of undivided loyalty and full ▆▆▆▆▆▆ ▆ disclosure and accounting, but, having performed these fiduciary duties, it is clear from what was done by the parties that the remaining relation was that of debtor and creditor as to the proceeds of sales collected by appellee—and no other relation. Now the parties arrived at the last date of settlement with only the current month's shipments due from the second party, and with no entry upon its books of any setoff, counterclaim or recoupment due it from the first party. In the process of making the accounting for the last month's shipments, the appellee stated four grievances, and then for the first time placed entries on its books setting forth its damages resulting therefrom. As contemplated by the contract, the appellant sent a statement of the shipments of the last month to the appellee. These shipments totaled $183,672.04, after deducting commissions. On the 20th of the following month, the ap-

pellee sent a letter to the appellant of which the following is a copy:

"We herewith enclose our check to you in the sum of $136,164.04 in full payment of any and all monies due under our contract with you, which expired February 28th, 1939. You will notice in accordance with the attached statement—that we have deducted the following items:

| | |
|---|---:|
| Commission due on Coke in storage as of Feb. 28, 1939 | $24,000.00 |
| Commissions on Pea Coke Shipments | 11,058.00 |
| Commissions due on Foundry Coke sold through Hickman, Williams & Co. | 9,450.00 |
| Commissions due on Domestic Coke sold direct to your employees | 3,000.00 |
| Total | $47,508.00" |

A check was enclosed for $136,164.04, upon which was endorsed "In full payment of any and all claims of any nature to date".

The appellant had this check certified by the bank, (which, it is conceded, was the equivalent of ▆▆▆▆▆▆ ▆ obtaining payment thereon, 1 Am. Jur. 229, et seq.) and then notified appellee that it was not accepted in full and made demand for the balance. It later obtained the money on the check. This action is for that balance. It should be observed here that there is a slight discrepancy amounting to $336.60 between the pleading and proof. As this resulted from an item concerning which there never has been any dispute—its unsuspected presence has no legal significance so far as determining whether an accord and satisfaction was effected.

The petition contains allegations that the money collected from appellant's customers was a trust fund in the bank account of the appellee and the prayer was that the bank which was made a co-defendant be enjoined from reducing the deposit below the appellant's claim on the checks of the appellee, and in addition prayed for personal

237

judgment against the appellee for $47,844.60.

By answer the appellee alleged an accord and satisfaction based on the use by the appellant of the check under the circumstances, and, after admitting certain allegations, denied all others, thereby placing in issue the allegations of the petition setting forth the cause of action.

After a temporary restraining order was denied, the cause came on for hearing before the court and jury. At the close of all the evidence, both parties moved for an instructed verdict. The court overruled the appellant's motion and granted that of the appellee. The appellant's motion for a new trial was overruled and judgment rendered against it. It is from that judgment that this appeal was taken.

To reach a decision, it is necessary that we consider the evidence relating to the items of credit, recoupment, or setoff claimed in the letter in which the check was transmitted. We will consider the evidence in the order in which the items are listed in that letter.

The first credit claimed is commissions on coke in storage on February 28th, 1939. which was the date on which the contract period expired.

Now as the express terms of the contract provided only for commission on coke sold and contained no provision for compensation for coke in storage, it is manifest that some other basis of liability must be found. The evidence shows that the basis of this claim is that the appellant in violation of this contract reduced the amount of domestic coke and increased the amount of foundry coke produced, and also limited the area in which domestic coke could be sold to Indianapolis and vicinity. There is evidence that the appellee could have sold all the coke had the appellant continued to produce the same quantities of each grade of coke as theretofore produced.

As already pointed out, this contract did not bind the appellant to continue to produce coke. It did not bind it to produce any particular grade in the event it elected to continue to produce

coke In our view, the appellee was wrong in its interpretation of this contract. However, it did protest and counsel have quoted the provision of the contract in which the appellee agreed to actively exert itself in creating a market, which they contend justify the appellee's interpretation. While we cannot agree that the cited provision is susceptible of such construction, we cannot say that it is so unreasonable that the appellee's protest was not made in good faith. The appellant placed somewhat in jeopardy its rights under a valuable contract by making the protest, which we cannot assume it would do lightly. On the other hand, we are equally unable to say that the claimed deduction was made in bad faith. The fact that the appellee allowed the subject to drop for several years and rendered many monthly statements without mentioning it is some evidence that it either did not believe in the protest originally or had later revised its original belief. The inference of good or bad faith could only be drawn by a trier of the facts.

The second deduction relates to Pea Coke shipments. The basis for this as shown by the evidence is coke sold in truck load lots from the appellant's ovens. The contract provided that the commission of appellee should be five per cent "of the price of all such product so sold by said party of the second part, f. o. b. cars at the ovens of the party of the second part". This coke was not placed in cars. It was placed in trucks. All during the years preceding this contract the appellee had never been paid a commission on such coke and just before this contract was entered into the appellee wrote to the appellant that it understood that it was entitled to no commission on such coke.

We fail to see any basis in reason for raising this issue on final settlement, and are forced to the conclusion that it must be said to lack bona fides.

The third deduction is of commissions on foundry coke sold through Hickman, Williams & Company. Now it

clearly appears in the evidence that when appellant increased the amount of foundry coke, the appellee was unable to dispose of the increased quantity. The contract in express terms authorized the appellant under such circumstances to contract with another agent to dispose of the surplus. It did that and we fail to find any substantial evidence that appellee disputed the fact that it was unable to dispose of the increased production of foundry coke. Its objection was to the fact of increased production. There was no denial of the right to employ Hickman, Williams & Company to dispose of this surplus if the appellant had the right to shift the preponderant production from domestic to foundry coke.

Aside from this, however, there was objection to the conduct of Hickman, Williams & Company in the sale of this surplus, in that in certain specific instances they intruded themselves between appellee and customers after appellee had started negotiations, and induced such customers to send in orders through them when but for such interereference the customers would have submitted the orders through appellee, who would then have been entitled to the commissions on such sales.

It is fundamental in the law of contracts that where a binding promise is made from which benefits ██ would accrue to the promisee the promisor impliedly agrees to do nothing that would deprive the promisee of such benefits, or of the opportunity to endeavor to reap such benefits. 9 O. Jur. 543, 567, et seq. A grantor or promisor cannot derogate from his own grant. Therefore, the appellant by reason of this contract was obligated not to interfere between the appellee and any of its customers with whom it was negotiating, and if it did that directly or through an agent, it would be liable for all damage directly flowing from the breach of this implied term of the contract. This damage certainly could not exceed the commissions on the sales which were in process of negotiation at the time of the interference. It would not entitle the appellee to commissions on other sales made by Hickman, Williams & Company, which they had a right to make.

We are of opinion that there is evidence of a bona fide dispute between the parties on this subject.

The last item deducted was for domestic coke sold by the appellant itself to its own employees.

On this item we have the evidence of the contract which gives to the appellee the agency for all the coke produced by the appellant "which is not required—for its own use", and the opportunity to earn a commission thereon by selling it in car-load lots, and on the other hand evidence that the appellant sold coke to its own employees for many years without objection from the appellee. In the absence of a construction placed upon the language of the contract by the parties, it seems clear that the agency covered all coke produced except that which the appellant as a corporate entity used in its business and that the requirements of its employees would not be within the exception. The extent of the appellee's knowledge would have weight in determining that issue. If it should appear that this course was pursued over a long period and that the appellee acquiesced therein without protest, that practical construction placed upon the terms of the contract would prevail over the strict meaning of the terms of the contract itself.

We cannot say that there is no substantial evidence of a basis for a bona fide dispute upon this subject.

(1) While we find evidence of a bona fide dispute in some instances, in none of them do we find the evidence of bona fides conclusive. It is conceded that where a dispute is asserted ██ as the consideration for an accord and satisfaction, it is essential that the assertion must be made in good faith. That is the uniform tenor of the authorities. Seeds, Grain & Hay Co. v Conger, 83 Oh St 169; Bettman v Sporkin, 6 Oh Ap 23; Underwood v Browning, 55 Oh Ap 268; 1 Am. Jur. 249 et seq.

It is equally incontrovertable that in this state, where the evidence upon an issue of fact is such, that conflicting inferences may reasonably be drawn, the issue must be submitted to a jury as the trier of the facts, unless a jury is waived. **Hamden Lodge v Gas Co., 127 Oh St 469.** And where good faith is an essential element of a cause of action or defense, it is unusual that the evidence is so conclusive that it can be said as a matter of law that there is or is not good faith. Such a finding in favor of the litigant upon whom the burden of proof rests is seldom, if ever, justified.

We, therefore, conclude that in any event the court erred in instructing a verdict for the appellee and that for that reason this judgment must be reversed.

(2) But counsel urge that as the appellee was an agent—a fiduciary—it could not under any circumstances, no matter how bona fide the dispute, avail itself of the defense of accord and satisfaction. Hudson v Yonkers Fruit Co., 258 N. Y. 168; Topas v Grant, 18 Fed. (2d.) 724 and 6 Williston on Contracts, 5215, are cited in support of the contention. And we are told that in citing these cases, counsel has marshalled in his support three of "The greatest names in American law—Williston, Cardozo, Learned Hand." There is no doubt about the prestige of these names, and if they have concurred in an unequivocal pronouncement, that under no circumstances may an agent avail himself of the defense of accord and satisfaction in an action against him by his principal, only a profound conviction reached after an exhaustive study would cause us to conclude otherwise. The decision of this case requires us to investigate the statements of these and other authorities on this subject. In evaluating these statements, we must consider the circumstances of the cases in which they were made, and any clarafication that may be found in other statements in the same or other cases.

The case chiefly relied upon is Hudson v Yonkers Fruit Co., 258 N. Y. 168. It is easily distinguishable on its facts. There was a single transaction. The principal had a quantity of apples which he requested the agent to sell. This he did and collected the price. He deducted ten per cent as a commission and remitted the balance accompanied by a letter which did not clearly and distinctly notify the principal that the check was tendered in full settlement of all claims. The principal used the check, but at the same time notified the agent that he had agreed to act as agent without compensation. In the action by the principal to recover the balance, the jury found that that was the agreement. The court found against the agent for the reasons (1) that there had been no dispute, (2) that the agent had deducted nothing from the amount of commissions claimed, (3) that as the amount collected, less any lawful commissions, belonged absolutely to the principal, the law would not countenance the act of an agent in withholding money collected for the principal under a threat that no part would be remitted unless the principal would approve deductions made by the agent, and (4) that the agent had not clearly notified the principal that the check was tendered on condition that it must be rejected if any item of the account was thereafter to be questioned. It will be seen that what the agent did in accounting to his principal had many infirmities as an accord and satisfaction.

The meaning of Cardozo, J., is illuminated by the cases to which he referred. He characterized the conduct of the agent as an unlawful abuse of a fiduciary relation citing Britton v Ferrin, 171 N. Y. 235, which was a case in which it was held that a factor had no title to funds collected for his principal in the absence of an agreement or custom and could not set off a claim against his principal which he had bought from another because the claims were not mutual under the New York statute authorizing set-offs; and the case of Morris v Windsor Trust Co., 213 N. Y. 27, in which he speaking for the

court held that in an action by a trustee in bankruptcy against a pledgee for the conversion of the pledge, the pledgee could not set off a claim growing out of an entirely different transaction, and this for the same reason. Then he placed the case in the category of Mance v Hossington, 205 N. Y. 33, 36, and Eames Vacuum Brake Co. v Prosser, 157 N. Y. 289, in both of which the debtor had not made it clear that the acceptance of the check or money was to be on the condition that it would be a full settlement of all demands.

In the opinion in Hudson v Yonkers Fruit Co., it is said:

"We do not need to determine whether a condition would be lawful if the tender by the agent were to involve some abatement of deductions that might otherwise be his. Sufficient for the decision of this case is the ruling that the condition is unlawful when what is paid is no more than must certainly be due."

After carefully considering the opinion of Cardozo, J., in Hudson v Yonkers Fruit Co., we are of the opinion that he did not intend to say and did not say that no matter how perfectly the legal requirements of an accord and satisfaction were complied with, an agent could not under any circumstances avail himself of it. If that had been his meaning, it would have been unnecessary for him to enter into the long discussion of the law of accord and satisfaction in order to determine into what category the case before him should be placed.

Judge Learned Hand in the case of Topaz v Grant, 18 Fed. (2d.) 724, was careful to limit the non-applicability of accord and satisfaction to the relation of principal and agent, when the agent was custodian of a res or fund, as shown by counsel's quotation from his opinion that: "The doctrine does not avail a fiduciary whom equity treats as holding the res in a separate capacity." He makes it perfectly clear that he is considering agencies involving elements of trust or bailments. His thesis was that as against such claims there could be no setoff of an inde-

pendent contractual liability in favor of the agent, trustee, pledgee, or bailee, and that the setoff could not be converted into a defense through an accord and satisfaction based upon a delivery of the res abated by the amount of the set-off. He says:

"The transactions are regarded as independent of each other, and we say that there is no implied understanding that they shall cancel each other * * * Succinctly we say that it would be unjust now to treat them so, just as by a contrary imputation we say the opposite when the items are contractual."

Now Prof. Williston has discussed this subject in 1 Williston on Contracts (Rev. ed.), sec. 129, p. 439 under the section title "Payment of so much of an unliquidated or disputed claim as is admittedly due is sufficient consideration." He states that it might seem that payment of that which was admittedly due would not be a consideration, and that some courts so hold, but that the majority holds otherwise. In the footnote he says:

"And even under the majority view, this doctrine has been applied where the debtor owes a fiduciary duty to the creditor, e. g., as factor and principal. Topas v Grant, 18 F. (2d) 724, 52 A. L. R. 807, (C. C. A. 2), cert. den. 274 U. S. 754 Hudson v Yonkers Fruit Co., 258 N. Y. 168, 179 N. E. 373, noted (1932), 17 Corn L. Q. 657. Contra, Calif. Bean Growers Ass'n. v Rindge; etc. Co., 199 Cal. 166, 248 P. 658, 47 A. L. R. 904."

And the author places these cases in a footnote to §1854 in volume six. That section is headed "Check sent in payment of disputed claim." And most of them are found in the annotation to §1862A, Vol. 6, p. 5229, headed "Statement of accounts of fiduciary", in which Prof. Williston discusses at some length settlements by fiduciaries. He says:

"There is some authority indicating that where a fiduciary renders an account in his fiduciary capacity, it may not become an account stated. But this view has been rejected on the ground that the necessary capacity to

contract in such a case does not differ from that required in other cases, and so one is not prevented from entering into an account stated with another merely because he is a fiduciary of the latter. Clearly, accounts may be stated between any persons, regardless of their relation, as long as there is assent to an account tendered and received in final settlement. Whenever one person is in a continuous relation with another, however, it is more difficult to find a settlement intended to be final than when the relation is casual, and when there is a fiduciary relation, the account may more easily be opened for fraud and mistake. Furthermore, the courts are more loath to infer assent from acts or omissions in response to an account rendered by a fiduciary. Only to this extent, may the fact that the account is stated between persons in a fiduciary relation bear on its validity."

It will be seen that he treats the fiduciary relationship not as an absolute bar preventing a settlement by the fiduciary, but rather as a factual circumstance in the presence of which the fact of compromise and settlement must be determined by considering it with all the other circumstances.

The rule which we deduce from the authorities is that if the defendant relying upon an accord and satisfaction had the right at the time to insist that the dispute be settled before paying the plaintiff, then the plaintiff's character, whether debtor, agent, or whatnot, is immaterial. If the elements of an accord and satisfaction are present it is a defense. If the subject-matter of the bona fide dispute is such that had the plaintiff sued thereon the defendant could under the law rely upon his claim in the action by way of recoupment, counterclaim, or set-off, or in any way reduce the amount of the plaintiff's claim, by a credit in his favor, then the parties may become bound by a compromise and settlement so as to preclude the plaintiff from securing a judicial inquiry into the merits of the original claim, and the fact that the claim of recoupment, set-off, counterclaim, or abatement appears to have been without merit does not affect the validity of the accord and satisfaction. If made in good faith, its settlement is a sufficient consideration to support the accord and satisfaction.

On the other hand, if the defendant's claim is not of equal dignity under the law, so that, no matter how meritorious, it cannot be availed of to defeat or reduce the plaintiff's claim, then the defeat of the claim cannot be accomplished through the plea of an accord and satisfaction.

These litigants were bound by a contract containing many express and implied covenants, some binding on both and others binding only on one or the other. They operated under it for five years during which many hundred transactions took place, totaling several million dollars. It was a complicated relationship, out of which cross-demands would be expected to frequently arise, even though both parties were actuated by good will.

Is it conceivable that these eminent authorities intended to state a principle that would require one of the parties to yield to the maximum demands of the other? Is it to be supposed that they intended to require the agent to pay to the principal the total of credits in its favor without deducting a single debit? Or to say that the law would not permit them to discuss the accounting and to reach an agreement which when executed would bind both? We do not believe such was their intention. And if the parties could reach a binding agreement, did these eminent authorities mean to say it could not be done through an accord and satisfaction, arrived at by a check tendered in full satisfaction and accepted with full knowledge of the condition? Such a doctrine would deprive a principal and agent of the power to settle their disputes, which power inheres in every other relationship known to the law.

We are of the opinion that the de-

fense of accord and satisfaction was a defense to the appellant, but that on the evidence it was an issue of fact for the jury and that the court erred in treating it as an issue of law and instructing a verdict for the appellee.

For these reasons, the judgment is reversed, and the cause remanded for further proceedings according to law.

We find no other error in the record.

HAMILTON, PJ. & ROSS, J., concur.

## APPLICATION FOR REHEARING

No 5851. Decided May 5, 1941

Steer, Strauss & Adair, Cincinnati, for appellant.

Peck, Shaffer, Williams & Gorman, Cincinnati, for appellee.

BY THE COURT:

The application for a rehearing was granted in order that the court might have the benefit of the arguments of counsel on the question of whether the the decision in **Gholson v Savin, 137 Oh St 551,** required a conclusion in the case at bar different from that previously announced.

In the Gholson case the parties were dealing with a debt reduced to final judgment. There was no dispute about the amount. There could not be. The debtor admitted owing the total sum. He presented no setoff or counterclaim against the amount as a basis for an acceptance of less than the judgment. In that situation the judgment debtor offered less in full settlement of the whole debt and it was accepted. There could be no issue of bad faith in such a transaction. The agreement was executed deliberately and formally and as the court said "was not only in writing but was carried into an entry and made part of the court record. This was sufficient to constitute a complete release."

In the case at bar, the facts are strikingly different. The parties were not dealing with a single indebtedness in the form of a judgment, which could not be disputed. They were dealing with a complicated account. It is true that the defendant admitted the charges against it, but at the same time, it asserted set-offs covering a period of almost five years, of some of which the plaintiff had never heard, and to none of which had it ever agreed.

Furthermore, the parties never met and deliberately and formally agreed to an accord and satisfaction in this case. The sole basis of the claim of accord is the exercise of dominion over the check tendered in full satisfaction.

In Gholson v Savin, supra, the court made no mention of the case of **The Seeds Grain & Hay Co. v Conger, 83 Oh St 169,** and similar cases involving the retention of checks tendered in full satisfaction. The case at bar falls in that category, and according to them, the debtor's good faith is an element of the defense of accord and satisfaction.

After reconsidering this case in the light of Gholson v Savin, we have concluded that it does not require a conclusion different from that previously announced.

We, therefore, adhere to our original conclusion.

MATTHEWS, PJ., ROSS & HAMILTON, JJ., concur.