[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 121.]

HANING ET AL., APPELLANTS, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Haning v. Pub. Util. Comm.*, 1999-Ohio-90.]

*Public Utilities Commission—Suppliers of liquid petroleum gas are not public utilities subject to commission oversight and regulation under R.C. Title 49.*

(No. 97-2267—Submitted April 20, 1999—Decided July 28, 1999.)

APPEAL from the Public Utilities Commission of Ohio, Nos. 97-32-GA-CSS, 97-33-GA-CSS, 97-97-GA-CSS and 97-268-GA-CSS.

———————————

{¶ 1} This appeal involves orders of the Public Utilities Commission of Ohio ("commission") in complaint cases brought by the appellants against two suppliers of liquid petroleum ("LP") gas ("respondents"). The orders complained of in the appeal dismissed the appellants' complaints for lack of jurisdiction over the respondents on the ground that they were not public utilities subject to commission oversight and regulation under R.C. Title 49. The respondents below entered their appearances as appellees in this appeal, together with the commission.

{¶ 2} The causes are before this court upon an appeal as of right.

———————————

*Gary M. Smith, Robert R. Romaker, James Daniels* and *Kalpana Yalamanchili,* for appellants Rebecca Haning, Melvina Stephenson, Bernard Marshall, Rodney Reisinger, Larry Mick, and Dorothy Mick.

*Betty D. Montgomery*, Attorney General, *Duane W. Luckey, Thomas W. McNamee* and *Tanisha L. Lyon*, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

*J.B. Yanity,* for appellee Rutland Furniture, Inc.

*Cavitch, Familo, Durkin & Frutkin* and *Karen L. Giffin,* for appellee Level Propane Company, Inc.

*John S. Marshall,* urging reversal for *amici curiae,* Ohio Partners for Affordable Energy and Ohio Association of Community Action Agencies.

*Sowash, Carson & Ferrier* and *Jonathan B. Sowash,* urging reversal for *amici curiae,* Rural Action, Inc. and Appalachian Peoples Action Coalition.

*Nancy Brockway, pro hac vice*, urging reversal for *amicus curiae,* National Consumer Law Center.

*Means, Bichimer, Burkholder & Baker Co., L.P.A., Craig D. Leister* and *Matthew J. Markling,* urging affirmance for *amicus curiae,* Ohio Propane Gas Association.

_____

**LUNDBERG STRATTON, J.**

**{¶ 3}** Rebecca Haning and Melvina Stephenson brought suit against a supplier of LP gas in the Athens County Municipal Court for alleged violations of the Ohio Consumer Sales Practices Act (R.C. Chapter 1345). The municipal court entered summary judgment for the LP gas supplier, and Haning and Stephenson appealed to the Court of Appeals for Athens County.

**{¶ 4}** On September 30, 1996, the court of appeals affirmed the municipal court on the ground that the LP gas supplier, Rutland Furniture, Inc., d.b.a. Rutland Bottled Gas Service ("Rutland"), was a "natural gas company" under R.C. 4905.03(A)(6) and, therefore, the Ohio Consumer Sales Practices Act was not applicable. The appellate court pointed out that the otherwise relevant provisions of the Ohio Consumer Sales Practices Act apply only to consumer transactions set forth in R.C. 1345.01(A) and that that statutory provision contains the following exception: " '[C]onsumer transaction' does not include transactions between persons, defined in R.C. 4905.03 and their customers * * *." *Haning v. Rutland Furniture, Inc.* (1996), 115 Ohio App.3d 61, 63, 684 N.E.2d 713, 715. The

2

appellate court refused reconsideration on December 2, 1996. Neither Haning nor Stephenson appealed the appellate court's decisions.

{¶ 5} Rather, on January 10, 1997, Hanning and Stephenson filed a complaint with the commission, alleging that Rutland had provided inadequate service and had engaged in various wrongful business practices in violation of R.C. 4905.22 and 4905.30 (case No. 97-32-GA-CSS). On July 17, 1997, the commission issued its entry, granting Rutland's motion to dismiss the complaint on the grounds that Rutland was not a public utility and, therefore, the commission lacked subject matter jurisdiction in the complaint case.

{¶ 6} In the meantime, four other individuals filed complaints with the commission against another LP gas supplier, Level Propane Co., Inc. ("Level"), alleging that Level had provided inadequate service and had engaged in wrongful business practices in violation of R.C. 4905.22, R.C. 4933.122(A) and (B), and R.C. 4905.30 (case Nos. 97-33-GA-CSS, 97-97-GA-CSS, and 97-268-GA-CSS, collectively "97-33-GA-CSS"). On August 14, 1997, the commission issued its entry in the consolidated case, No. 97-33-GA-CSS, dismissing the complaints against Level on the same jurisdictional ground as was advanced for the dismissal of the complaint against Rutland in commission case No. 97-32-GA-CSS.

{¶ 7} Pursuant to R.C. 4903.10, on August 15, 1997, the complainants timely filed a consolidated application for rehearing, directed against the dismissal entries in the complaint cases. On September 4, 1997, the commission issued its entry on rehearing, denying the complainants' application. Pursuant to R.C. 4903.11 and 4903.13, on October 31, 1997, the complainants filed their notice of appeal herein from the commission's orders.

{¶ 8} The first issue we address is whether Rutland and Level are "gas compan[ies]" under R.C. 4905.03(A)(5) or "natural gas compan[ies]" under R.C. 4905.03(A)(6). If so, they are "public utilit[ies]" under R.C. 4905.02, which are

subject to the regulatory jurisdiction of the commission under R.C. 4905.04 and Title 49.

{¶ 9} With four stated exceptions, R.C. 4905.02 provides that a " 'public utility' *includes* every * * * [entity] * * * defined in section 4905.03 of the Revised Code * * * ." (Emphasis added.) R.C. 4905.03 lists and describes the characteristics of fourteen different public utility businesses. Only two of the fourteen businesses described in R.C. 4905.03 could be considered to have characteristics in common with the businesses of Rutland and Level. Those two are a "gas company," characterized in R.C. 4905.03(A)(5), and a "natural gas company," characterized in R.C. 4905.03(A)(6):

"(5) A gas company, when engaged in the business of supplying artificial gas for lighting, power, or heating purposes to consumers within this state * * *.

"(6) A natural gas company, when engaged in the business of supplying natural gas for lighting, power, or heating purposes to consumers within this state. * * *"

{¶ 10} Both Rutland and Level are in the business of supplying LP gas to consumers. LP gas in common parlance has been called "propane," but LP gas is not purely propane. In LP gas, propane is merely one, albeit the dominant, of several hydrocarbon compounds in a mixture that includes propylene, n-butane, and i-butane. In contrast, natural gas often contains no propane. Even when it contains a trace amount of propane, its dominant hydrocarbon compound is methane.

{¶ 11} Natural gas is "produced" by withdrawing it from the ground. It is then delivered to customers through pipes without further processing. It is delivered in its natural state. On the other hand, there is no natural state for LP gas, because it is a product manufactured in the process of refining crude oil. Thus, LP gas is a manufactured rather than a "natural" gas.

{¶ 12} Based on the foregoing, the court of appeals was in error in finding that "propane is a 'natural gas' and that Rutland is a 'natural gas company' as used

4

in R.C. 4905.03(A)(6)." *Haning*, 115 Ohio App.3d at 64, 684 N.E.2d at 715.[1]  It would likewise be error for us to find that Rutland and Level are in the business of supplying "natural gas" under R.C. 4905.03(A)(6) and, therefore, are "natural gas compan[ies]."

{¶ 13} Having determined that Rutland and Level are not "natural gas compan[ies]" under R.C. 4905.03(A)(6), it is necessary to consider whether Rutland and Level qualify as "gas compan[ies]" under R.C. 4905.03(A)(5) by virtue of their "engag[ing] in the business of *supplying artificial gas* for lighting, power or heating purposes to consumers * * *."  (Emphasis added.)

{¶ 14} The commission argues that the LP gas product supplied by Rutland and Level is not an "artificial gas" because it is a liquid *when it is supplied* to customers.  LP gas can be either in the form of a gas or a liquid.  When it is manufactured by an oil refiner in the cracking process and when it is consumed by a customer to produce a flame, it is in the form of a gas.  However, when possession of LP gas is delivered to an LP gas supplier, it is under pressure and is in the form of a liquid and remains a liquid at all times while the supplier transports it, stores it, and ultimately transfers possession and ownership of it to consumers.

{¶ 15} Upon delivery into their customers' bulk tanks, the product which has been "supplied" by Rutland and Level is a liquid.  It is only upon removal of the product from the bulk tanks by their customers that it is transformed into a gaseous state to be combined with oxygen for the purpose of combustion.

{¶ 16} The appellees point out that there are a number of products that are sold and delivered in the liquid state and consumed by customers in a gaseous state to produce heat or light.  Among them are gasoline, diesel fuel, fuel oil, methanol,

---

1. The complainants argued to the commission that *Haning* controlled with respect to its "natural gas company" determination and that relitigation of that issue before the commission was precluded by the doctrines of *res judicata* and collateral estoppel.  The commission properly rejected that argument in its July 17, 1997 entry.

ethanol, kerosene, acetylene (in tanks used for welding), and butane (in cigarette lighters).  The fact that these liquids are consumed in their gaseous forms to produce heat or light does not make their suppliers "gas compan[ies]" under R.C. 4905.04(A)(5).

{¶ 17} The appellants argue that it is irrelevant that the product delivered by Rutland and Level to their customers is a liquid, because it is a gas when it is consumed by them.  However, R.C. 4905.03(A)(5) refers to the "supplying" of a product, not to the "consuming" of that product, and appellants' argument ignores the fact that the product "supplied" by Rutland and Level is a liquid when possession and ownership of the product are transferred to the consumer.

{¶ 18} The appellants and the *amici curiae* in support of reversal argue that, even though Rutland and Level supply their product in liquid form, it is commonly thought of as a gas, and not being a "natural gas" under R.C. 4505.03(A)(6), it should be considered an "artificial gas" under R.C. 4905.03(A)(5).  Even if we accept *arguendo* that the LP gas product is referred to as a "gas" in common parlance, it does not fall within the category of "artificial gas" as that term is used in the statute.

{¶ 19} In the first place, appellants' argument leads to an absurd result.  If all products other than "natural gas" that are consumed in gaseous form to supply heat, light or power are included in the term "artificial gas," then R.C. Chapter 4905 would require that we consider their suppliers to be "public utilities."  This would mean that suppliers of acetylene used by welders, neon used in tubes for advertising signs, and krypton, halogen, and mercury vapor used in light bulbs would all be regulated public utilities, as well as the suppliers of gasoline, fuel oil, kerosene, methanol, and butane.

{¶ 20} Second, we must interpret the meaning of the statute as it was intended by the legislature.  The term "gas," as used in the statute, is not to be interpreted in its present-day sense.  As we said in *Circleville Light & Power Co.*

6

*v. Buckeye Gas Co.* (1903), 69 Ohio St. 259, 270, 69 N.E. 436, 439, "[w]hile the word 'gas' may be in one sense a *generic* term, it is quite plain that, as used in the statute, it does not embrace every species of gas discovered or manufactured in modern times. There are numerous gases, manufactured or generated, which are used in art and manufacturing, none of which was contemplated in the enactment of [General Code] section 3551."[2] (Emphasis *sic*.)

{¶ 21} As used in R.C. 4905.03, "artificial gas" and "natural gas" are terms of art. When the predecessor of the Public Utilities Commission[3] was created by the Utilities Act of 1911 (G.C. 614-1) and the predecessor of R.C. 4905.03 was enacted (G.C. 614-2), the General Assembly meant to regulate suppliers of specific products, "natural gas" and "artificial gas," as the General Assembly knew those products to be at that time. 102 Ohio Laws 549, 550-551. The General Assembly could not have contemplated that LP gas would be embraced by either the term "natural gas" or the term "artificial gas" because LP gas did not then exist as a substance used in commerce.[4] We look to the circumstances existing at the time of the legislative enactment that first employed those terms, as we did in *State ex rel. Toledo Edison Co. v. Clyde* (1996), 76 Ohio St.3d 508, 512, 668 N.E.2d 498, 503.

{¶ 22} Later, we recognized that Cincinnati Gas & Electric Company provided "artificial gas" service between 1837 and 1905, under several franchises

---

2. Section 3551, referred to by the court, was a section of the Revised Statutes of the state of Ohio that was a predecessor of R.C. 4933.04. 71 Ohio Laws 93.

3. The Utilities Act of 1911 established the Public Service Commission of Ohio, which was the successor of the Railroad Commission and the predecessor of the commission.

4. "Although liquefied petroleum gas was discovered by chemists about 1910, it remained a waste product at the oil wells until the mid-1920s. Then, with the discovery of a more economical and convenient method for the capture and compression of the gas, the oil companies began to ship the new product in cylinders to individual customers." Annotation (1972), 41 A.L.R.3d 782, 787.

from the city of Cincinnati,[5] a fact doubtless known to the General Assembly in 1911. *Cincinnati v. Pub. Util. Comm.* (1940), 137 Ohio St. 437, 439, 19 O.O. 143, 144, 30 N.E.2d 797, 798. This "artificial gas" was known as "illuminating gas" and was used in gas lamps. It was made by heating coal in retorts and sometimes was a byproduct of the production of coke. See *Cincinnati Gas Light & Coke Co. v. Ohio* (1868), 18 Ohio St. 237, 1868 WL 22; *Cincinnati Gas & Elec. Co. v. Johnston* (1907), 76 Ohio St. 119, 81 N.E. 155; *Cincinnati,* 137 Ohio St. at 439-440, 19 O.O. at 144, 30 N.E.2d at 798; and *Indianapolis v. Domhoff & Joyce Co.* (1941), 69 Ohio App. 109, 23 O.O. 547, 36 N.E.2d 153.

{¶ 23} The illuminating gas known as "artificial gas" to the General Assembly in 1911 preceded "natural gas" as a commercially viable product. For example, in 1901, this court observed in a discussion of an ordinance that became effective February 11, 1895, that the ordinance "was enacted long before natural gas became an article of commerce * * *." *Logan Natural Gas & Fuel Co. v. Chillicothe* (1901), 65 Ohio St. 186, 208, 62 N.E. 122, 124. In 1903, this court remarked that natural gas "was not known as an article of commercial use in Ohio * * * in 1874 * * *." *Circleville Light & Power Co.,* 69 Ohio St. at 269, 69 N.E. at 438. In 1907, the court noted that natural gas was neither used, nor believed to be suitable, for lighting and did not become available for such use until 1896 or 1897. *Columbus v. Columbus Gas Co.* (1907), 76 Ohio St. 309, 81 N.E. 440.

{¶ 24} Therefore, from a historical perspective, it is evident that the General Assembly in 1911 intended that its newly established Public Service Commission would regulate providers of the already familiar illuminating gas, as well as the newcomer, natural gas. Both were delivered to consumers through pipes. LP gas,

---

5. For a discussion of legislation about municipal regulation of artificial gas companies in the last century, see *State ex rel. Hamilton Gas & Coke Co. v. Hamilton* (1890), 47 Ohio St. 52, 23 N.E. 935.

which is delivered to consumers by tank truck, could not have been included; it did not yet exist as a product of commerce.

{¶ 25} The General Assembly has taken no action since 1911 to include LP gas in the "artificial gas" coverage of R.C. 4905.03(A)(5), and it has consistently distinguished LP gas (or propane) from "natural gas," which is covered by R.C. 4905.03(A)(6).  While the statutes have been recodified several times, R.C. 4905.03(A)(5) and (6) and their predecessors still employ substantially the same language and terminology as the 1911 enactment, codified at a time when LP gas did not exist as a commercial product.

{¶ 26} On the other hand, after LP gas was developed into a commercial product, the General Assembly enacted legislation referring to "[l]iquefied petroleum gas" and "propane" in a number of  statutory provisions or schemes that contain one or both of those terms.  See, *e.g.*, R.C. 4104.41, 5117.01, and 5709.45.  Those provisions or schemes distinguish between LP gas/propane and natural gas or distinguish between a supplier of LP gas/propane and a gas company or a natural gas company.

{¶ 27} While the General Assembly has not amended R.C. 4905.03(A)(5) to indicate that "artificial" gas includes LP gas/propane, neither has it amended R.C. 4905.03 to add suppliers of LP gas/propane to the list of "compan[ies]" set forth in R.C. 4905.03 that are considered to be public utilities under R.C. 4905.02.  We agree with the commission that the General Assembly's failure to act in connection with LP gas/propane suppliers under R.C. 4905.03 indicates that it has intended that LP gas/propane suppliers not be regulated as public utilities under R.C. Title 49.

{¶ 28} LP gas/propane is not a "natural gas" under R.C. 4905.03(A)(6).  Nor is it an "artificial gas" under R.C. 4905.03(A)(5), because it is a liquid when delivered to suppliers and when possession and ownership of it are transferred to customers.

**{¶ 29}** Even if LP gas/propane is considered *arguendo* to be a gas, there is no indication that the General Assembly in 1911 or thereafter intended it to be within the comprehension of "artificial gas" under R.C. 4905.03(A)(5). Suppliers of LP gas/propane are not included under either R.C. 4905.03(A)(5) or 4905.03(A)(6). Thus, they are not "public utilit[ies]" by statutory definition under R.C. 4905.02, which are subject to the jurisdiction of the commission under R.C. 4905.04.

**{¶ 30}** The appellants concede that a business enterprise must be a public utility under R.C. 4905.02 in order for the commission to have jurisdiction over it and to regulate it under R.C. Title 49. They argue that, while R.C. 4905.02 refers to R.C. 4905.03 as including various listed entities, it does not *limit* that status to just those entities. They go on to argue that alternative to and independent from inclusion in the R.C. 4905.03 listing of entities that are deemed to be public utilities, under case law, a company is a public utility subject to the commission's jurisdiction if it satisfies a two-part test: (1) the business is reasonably and indiscriminately made available to the public, and (2) the nature of the business is a matter of public concern.

**{¶ 31}** As authority for their claimed common-law determination of public utility status, the appellants cite our decisions in *Marano v. Gibbs* (1989), 45 Ohio St.3d 310, 544 N.E.2d 635, *Ohio Power Co. v. Attica* (1970), 23 Ohio St.2d 37, 52 O.O.2d 90, 261 N.E.2d 123, and *Indus. Gas Co. v. Pub. Util. Comm.* (1939), 135 Ohio St. 408, 14 O.O. 290, 21 N.E.2d 166.

**{¶ 32}** However, none of the cited cases supports the appellants' argument. None of them stands for the proposition that, alternatively to and independently from qualifying as a *statutory* public utility, a business enterprise will be considered a public utility for the purpose of application of R.C. Title 49 if it satisfies the appellants' two-part test. However, it should be noted that if this two-part test has significance to this appeal, the commission specifically found on rehearing that the

businesses of Rutland and Level fail to meet one of the tests: "[N]either company's business is a matter of public concern."

{¶ 33} Both the appellants and the appellees have identified the common-law characteristics of business enterprises that have been determined to be public utilities by this and other Ohio courts for purposes other than regulation under R.C. Title 49.[6] However, neither the appellants nor the appellees have pointed to a single decision of the commission or this court wherein a business enterprise was determined to be a public utility for purposes of application of R.C. Title 49 by reference to common-law, public-utility characteristics to the exclusion of consideration of the statutory characteristics described in R.C. 4905.03.

{¶ 34} Case law authority does not support a finding that an LP gas/propane supplier is a "public utility" under R.C. 4905.02 by virtue of consideration of the common-law characteristics of a public utility to the exclusion of consideration of the statutory characteristics of a public utility.

{¶ 35} There is neither statutory nor case law authority that would support a finding that Rutland and Level are "public utilities" under R.C. 4905.02. Therefore, the commission properly dismissed the complaints for lack of jurisdiction over them under R.C. Title 49. We affirm the commission's orders.

*Orders affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

––––––––––––––––––

6. Examples of other purposes include taxation and zoning.