[Cite as *Fox v. Fergus Capital, L.L.C.*, 2024-Ohio-2255.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

ROBERT FOX,

Plaintiff-Appellee,

v.

FERGUS CAPITAL, LLC,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MA 0083**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2019 CV 02472

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges

---

**JUDGMENT:**
Affirmed.

---

*Atty. Timothy J. Cunning,* Scullin & Cunning, LLC, for Plaintiff-Appellee and

*Atty. Anne Marie Sferra, Atty. Augustus Flottman,* Bricker Graydon LLP, for Defendant-Appellant.

Dated: June 12, 2024

**Robb, P.J.**

{¶1}   Appellant, Fergus Capital, LLC, appeals the trial court's decision finding it was in breach of its agreement with Appellee, Robert Fox.   Appellant argues on appeal the trial court erred in interpreting the parties' agreement; the court erred by allowing the introduction of deposition testimony at trial as substantive evidence; and the trial court erred by finding Appellant did not establish it used its best efforts to satisfy the condition precedent.   For the following reasons, we affirm.

<u>Statement of the Facts and Case</u>

{¶2}   Appellee loaned Appellant $500,000 plus interest.   In December of 2019, Appellee, Robert Fox, filed suit against Appellant for breach of contract for its failure to pay Appellee according to the parties' written agreement.   Appellee also asserted a claim for an account stated, alleging Appellant did not object to notice of an account showing it owed Appellee $555,000.   Appellee sought judgment in that amount, plus interest, attorney's fees, and costs.   (December 5, 2019 Complaint.)

{¶3}   Appellee initially obtained a default judgment against Appellant.   Thereafter, Appellant secured relief from judgment pursuant to Civ.R. 60(B).   (November 4, 2020 Judgment.)   Appellant filed its answer to the complaint; denied it was in breach of the agreement; and raised several defenses.   (Answer.)

{¶4}   Appellee noticed the deposition of Appellant's corporate designee.   (July 13, 2021 Notice.)   Appellant moved for a protective order, which was granted in part. (September 28, 2021 Order.)

{¶5}   The case was set for bench trial on July 19, 2022.   The defense opening remarks conceded Appellant owed an amount of money pursuant to the Note.   However, Appellant argued it was not yet due and owed because the condition precedent had not been satisfied.

{¶6}   Two witnesses testified.   Robert Fox testified on his own behalf.   He owns a business that sells service contracts to individuals purchasing cars.   His company also provides a service to clients called reassure, which aids certain companies with tax issues.

**{¶7}** Through his business, Fox became acquainted with Marc Feaster, one of the owners of Appellant. Fox eventually loaned Feaster's company (Appellant) $500,000 in subordinated debt. Fox initially loaned Appellant $500,000 via a Note between Appellant and Fox's company Hollenbeck Re. in 2017. (Tr. 1-17.)

**{¶8}** In approximately December of 2017, Fox received a call from Feaster trying to raise "sub debt" meaning subordinate Fox's debt to another debt holder. Feaster asked that the first note's due date be extended. Fox recalled Feaster told him that he needed to have the note mature a year later to prevent Fergus from defaulting on its loan, the one to which Fox's note was subordinate. Fox described Fergus as having a good "track record," so he extended the first note. For the Amended Note, Fox became the lender for tax reasons. Fox purchased the note from Hollenbeck. (Tr. 17-23.)

**{¶9}** The second note, the Amended Note became due in November of 2019. Appellant owed Fox $555,000 consisting of $500,000 in principal and 11% interest. Feaster told Fox the day it was due that the company could not pay. Fox recalled how Feaster told him about efforts to raise money in Europe and New York. Feaster thought his efforts would be successful. (Tr. 24-30.)

**{¶10}** In the original Note, the Fox loan was subordinated to a senior debt holder identified as BP Fergus, LLC. Under the Amended Note, Maghan Advisors Fergus Capital, LLC was the senior debt holder. (Tr. 30-35.)

**{¶11}** After the lawsuit was filed, Fox learned that Appellant had also subordinated Fox's loan to another debt holder, Primalend. Fox denies giving Appellant permission to further subordinate his loan. (Tr. 37-39.)

**{¶12}** Marc Feaster testified that he operates two companies, one of which is Appellant, Fergus Capital. Feaster described its business as purchasing loans from "buy-here, pay-here" dealerships, and it also sub-services the loans. Feaster said the goal is to grow and build a large finance company. However, the company has not grown as fast as he expected, in part because of Covid. Yet, he feels the company is growing, and he expects to be able to pay off senior debt in six to eight months. (Tr. 39-50.)

**{¶13}** Feaster and Chris Daly made the initial investments in Fergus Capital. They have not yet received a return on their investment. Feaster said his initial investment is

subordinate to the company's other outstanding debts and lenders, stating "he eats last." (Tr. 53.)

**{¶14}** Feaster said Appellant and Fox's company were not competitors. Feaster explained that he believes Fox wanted to invest in Appellant, which resulted in the original note. The original note had Fox's debt or loan subordinated to BP Fergus or Beach Point Fergus. Appellant borrowed about six or seven million dollars from BP Fergus. Later, other senior investors took over the Beach Point loan and paid it off. So "they became the new senior lender and * * * required everyone else to be subordinate to them." This led to Appellant's revision of its note with Fox. Feaster believes the only changes to the Amended Note were the maturity date and the change in the name of the senior debt holder. Appellant has continued to pay its interest due under the note in the amount of $45,000 per year. (Tr. 58-62.)

**{¶15}** Feaster said his company never struggled to pay interest payments. It was never late on interest payments. However, Appellant did not have the ability to pay off the $500,000 principal in 2019 when it was due. Feaster also said that even if his company had the money, they would have had to secure the senior debt holder's permission to pay Fox first. (Tr. 64-65.).

**{¶16}** When asked about his company's efforts to repay the senior debt holders so it could pay Fox under the Amended Note, Feaster said:

> [W]e've been in constant conversations with investment banking firms, cornerstone banks, like Bank America, Wells Fargo, Family Offices, different financing entities. * * * I'd say to date we've spoken to nearly 100. We've gotten very good reception from 10 to 12. We just have not been able to come to terms with a structure that would allow us to refinance the senior debt and simultaneously retire Mr. Fox's debt.

(Tr. 65-66.)

**{¶17}** Feaster also explained that he went to significant lengths with certain lenders, who examined the company's historical performance, structure, how it operates, and how payments are received. The company has spent about $50,000 to $75,000 in attorney's fees trying to secure lenders. (Tr. 67-73.) Feaster acknowledges Appellant

Case No. 23 MA 0083

owes Fox the money, but said the company cannot pay it at this time since he "is at the behest of two senior lenders." (Tr. 74-76.)

**{¶18}** Feaster testified on cross-examination that he is a 50% owner of Appellant. His business partner, Chris Daly owns 30%, Daly's son owns 10%, and Daly's sister and daughter own 10%. He clarified that Appellant is in the business of buying high interest car loans at a discount from sub-prime automobile loans, meaning usually high interest loans with buyers who have poor credit. Both Feaster and Daly made initial investments to purchase the loans, but they then needed to borrow money to expand and purchase additional auto loans. (Tr. 79-81.)

**{¶19}** Feaster denied he was "making money" from the business because he has not yet made a return on his investment. But he did agree he was paid an annual salary of $250,000 in the years 2019, 2020, and 2021. Feaster also acknowledged the company has lost a significant amount of money. (Tr. 81.)

**{¶20}** When asked about whether the company was at risk of defaulting on the Beach Point loan, Feaster said he did not know because Daly handled the "day-to-day" business. Feaster said he knows Appellant extended the loan, but does not think they were at risk of defaulting. (Tr. 85-86.)

**{¶21}** Feaster was then asked about Chris Daly's deposition testimony. Feaster agreed Daly testified as the corporate representative. Feaster attended Daly's deposition, in part, but denied remembering his testimony about the Beach Point loan. At that point, Feaster's counsel objected and contended Fox's counsel was attempting to improperly introduce deposition testimony. Fox's attorney claimed it was an admission by a party opponent, and the court allowed the questioning. During this line of questioning, Fox's counsel read Daly's deposition testimony, during which Daly stated Appellant borrowed from Maghan to avoid defaulting on the Beach Point loan. (Tr. 88-90.)

**{¶22}** Feaster also testified on cross-examination that his company cannot pay off Fox's loan "because the senior lenders have not approved it." (Tr. 95.) Fox's counsel then asked what he meant by senior lenders plural, and Feaster explained he was referring to the Maghan and Primalend loans. Feaster then confirmed the Fox Amended Note did <u>not</u> include Primalend as a senior debt holder. He also confirmed the parties' agreement did not allow him to add another senior debt holder, to which Feaster

responded: "I haven't read it but I'll give you that one."  Counsel then asked him: "[S]o despite those facts, you meaning Fergus, have subordinated Mr. Fox to another debt holder, correct?  * * * [Answer] I guess, yeah."  (Tr. 95-97.)

**{¶23}** Thereafter, Feaster agreed there was only one senior debt holder at the time Fox agreed to extend his loan.  Notwithstanding, Feaster said the company has subordinated Fox's debt to another senior lender.  Additionally, since November of 2019, the company has borrowed more money from Maghan.  He agreed the company increased the amount of its senior debt and added another debt holder.  Feaster contends his company contacted more than 100 lenders, but none would loan Appellant the money with terms it found agreeable.  He agreed he would not take out another loan by which he could pay off Fox unless the loan terms were advantageous.  Appellant was seeking lower interest rates and more favorable terms.  One term in particular the company is seeking is an interest rate in the high single digits.  (Tr. 97-110.)

**{¶24}** Feaster stated: "I can't find the financing that allows me to retire Fox's debt." He explained he has certain interested investors, but they are waiting "because they want the size of the [company's] portfolio to be something that it's not quite at this moment." (Tr. 111.)  Feaster denied being able to borrow money from Primalend to pay off Maghan and Fox.  Instead, he said the Primalend funds are not available to pay off other lines of credit but may only be used to purchase "auto receivables."  (Tr. 111-114.)  Feaster then was asked:

Q  You do know that Mr. Fox has some kind of a business relationship with Primalend, correct?

A  Yes.

* * * *

Q  You certainly know that Primalend wants you to pay off Mr. Fox, correct?

* * *

A  They told me I could but they have not encouraged me to do so.

(Tr. 115-116.)  Feaster also testified that Maghan will not permit Appellant to pay off Fox. He said Appellant does not have the money to pay off Maghan.  (Tr. 117-118.)

**{¶25}** On redirect, Feaster was asked about his company's efforts to secure additional loans to pay off current lenders.  Feaster agreed that the goal of securing better

loan terms, which he had not yet obtained, was so that the business would be profitable and operate efficiently while also retiring Fox's debt. He described what he meant by "cheaper money" explaining that a loan at eight or nine percent interest makes the company profitable. The company is close to the size it needs to be to secure the loan terms it prefers and needs to be profitable, but it is not there yet. (Tr. 129-131.)

**{¶26}** Feaster then agreed that the only senior debt holder listed in the Amended Note with Fox is Maghan, but Feaster then said Maghan was also subordinate to Primalend. (Tr. 132-133.) Feaster testified about his efforts to pay off Fox by contacting Maghan, but Maghan will not allow the company to use its funds to pay the Fox debt. (Tr. 135.) Feaster testified that the terms of the loans Appellant could get are not favorable. The costs of refinancing and loan terms will cost the company money and result in a financial loss. (Tr. 138-139.)

**{¶27}** Feaster said if Fox wins this lawsuit, the company would be "forced to liquidate the book," and Fergus would have to first pay Primalend, second Maghan, and Fox third before Feaster and Daly. Feaster said this would result in Fox likely receiving nothing because there would not be enough money. (Tr. 143.)

**{¶28}** The magistrate found Appellant in breach of the parties' agreement based on its failure to repay the note amount. The magistrate acknowledged Appellant did not have a duty to repay until it repaid another debt, referred to as a senior debt. The court agreed it was a condition precedent per the agreement. Notwithstanding, the court found Appellant had breached since it attempted to create an additional senior debt holder and subordinate the amount owed to Appellee. The court concluded this was contrary to the parties' agreement. Moreover, the magistrate concluded Appellant's only witness lacked credibility. (October 25, 2022 Decision.)

**{¶29}** The magistrate concluded Appellant failed to show it used good faith and diligent efforts to pay off the senior debt. The magistrate relied on Appellant's act of adding a second senior debt holder, which was not authorized in the Amended Note. The magistrate also discredited Feaster's testimony in general to support its conclusion that Appellant did not act in good faith and use diligent efforts to satisfy the condition precedent of paying the senior debt. In support, the magistrate noted the following: Feaster's continued acceptance of his annual salary of $250,000; his lack of corroborating evidence

showing the company's efforts to contact more than 100 lenders; Feaster's testimony that Appellant could have secured the financing, but not on terms that would have advanced the company's bottom line; and Feaster's inability to testify, with specificity, as to the amount of the senior debt owed and the company's current financial position. The court awarded Appellee $555,000 in damages plus reasonable attorney's fees and costs. It ordered a separate hearing regarding attorney's fees. (October 25, 2022 Decision.)

**{¶30}** Appellant filed objections to the decision, which the trial court overruled. (Feb. 8, 2023 Judgment.)

**{¶31}** The magistrate held a second hearing as to costs and attorney fees. The magistrate awarded Appellee $47,438.16 in attorney fees and costs. (May 31, 2023 Magistrate's Decision.) Appellant filed additional objections.

**{¶32}** The trial court thereafter modified the magistrate's decision. It reduced the award and awarded Appellee $46,946.50 in attorney's fees and costs. (June 27, 2023 Judgment.)

**{¶33}** Appellant raises three assignments of error on appeal.

First Assignment of Error:  Definition of Senior Debt

**{¶34}** Appellant's first assigned error contends:

"The Trial Court erred when it incorrectly interpreted an unambiguous contract that should have been applied as written and that expressly allows Defendant Fergus to obtain other Senior Debt."

**{¶35}** Appellant argues the Amended Note was unambiguous, and as such, the trial court erred by employing contract interpretation principles in its analysis. Instead, Appellant contends the plain language of the Note should govern.

**{¶36}** Further, Appellant contends the trial court ignored the Amended Note's provision in Section 4(c) and (f), authorizing Appellant to obtain additional senior loans or debt. Appellant claims that because the Amended Note expressly authorized him to secure additional senior debt, the court's finding he did not act in good faith by doing so (and acting consistent with the contract terms) is erroneous and contrary to the plain language of the note.

**{¶37}** The construction of contracts is a matter of law, which we review de novo and without regard to the trial court's holding. *Cent. Funding, Inc. v. CompuServe*

Case No. 23 MA 0083

*Interactive Servs., Inc.,* 10th Dist. Franklin No. 02AP-972, 2003-Ohio-5037, ¶ 42, citing *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. We must read the applicable contract in its entirety, give effect to each provision, and ascertain the intent of the parties from considering it as a whole. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 16. "Courts should attempt to harmonize provisions and words so that every word is given effect." *Christe v. GMS Mgt. Co.,* 124 Ohio App.3d 84, 88, 705 N.E.2d 691 (9th Dist.1997).

> When construing a contract, a court's principle objective is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.,* 86 Ohio St.3d 270, 273, 1999 Ohio 162, 714 N.E.2d 898 (1999). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.,* 31 Ohio St.3d 130, 31 Ohio B.R. 289, 509 N.E.2d 411 (1987), paragraph one of the syllabus. Thus, where the terms of a contract are clear and unambiguous, a court cannot look beyond the plain language of the agreement to determine the rights and obligations of the parties. *Cocca Dev.,* 7th Dist. No. 08MA163, 2010-Ohio-3166, at ¶ 26, citing *Aultman Hospital Ass'n v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989). However, if a contract is reasonably susceptible to more than one meaning, then it is ambiguous and extrinsic evidence of reasonableness or intent can be employed. *Id.,* citing *City of Steubenville v. Jefferson Cty.,* 7th Dist. No. 07JE51, 2008-Ohio-5053, ¶ 22.

*7 Med. Sys., LLC v. Open MRI of Steubenville,* 7th Dist. Jefferson No. 11 JE 23, 2012-Ohio-3009, ¶ 27.

**{¶38}** "To construe or interpret what is already plain" is not our function when a writing is unambiguous. *Lake Hosp. Sys., Inc. v. Ohio Ins. Guar. Assn.*, 69 Ohio St.3d 521, 524, 634 N.E.2d 611 (1994), quoting *Iddings v. Bd. of Edn. of Jefferson Cty. School Dist.*, 155 Ohio St. 287, 290, 98 N.E.2d 827 (1951) (addressing statutory construction). Absent an ambiguity, courts must apply a contract "as written and conduct no further investigation." *State v. Hurd*, 89 Ohio St.3d 616, 2000-Ohio-2, 734 N.E.2d 365, citing

*State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584, 651 N.E.2d 995 (1995) (addressing statutory language). When read as a whole, we conclude the Amended Note at issue here is not ambiguous and does not permit Appellant to incur additional senior debt.

The Amended Note

**{¶39}** The Amended and Restated Promissory Note in the amount of $500,000 is dated December 28, 2017. It states, in part, in all caps and bold on the first page before the title and date of the document: "ALL INDEBTEDNESS EVIDENCED BY THIS NOTE IS SUBORDINATED TO SENIOR DEBT (AS DEFINED BELOW) TO THE EXTENT PROVIDED HEREIN." (Complaint, Ex. 1.)

**{¶40}** The Amended Note also states Appellant promises to pay $500,000 "and other amounts described herein" to Appellee on November 12, 2019 "together with all accrued but unpaid interest * * *." (Complaint, Ex. 1.)

**{¶41}** On page two under the heading "4. Subordination," the Amended Note states:

> a) Note Subordinated to Senior Debt. The principal, interest, costs, expenses and any other amounts at any time owed under this Note (collectively the "Junior Debt") *are expressly subordinated in the right of payment to the prior payment in full in cash of all Senior Debt* and the termination of all commitments ("Commitments") to provide credit under the Senior Debt Documents (as defined below). It being understood and agreed that the Junior Debt shall at all times be unsecured and the holder of the Junior Debt shall be prohibited from having any liens or security interests whatsoever in any of the assets or security of the Maker or any of its affiliates.

(Emphasis added.) (Complaint, Ex. 1.)

**{¶42}** Also, under the heading "4. Subordination," the Amended Note states in part in subsections 4(c) and 4(f):

> (c) Insolvency, Bankruptcy, Liquidation and Reorganization. In the event of any insolvency, * * * or other similar proceeding involving the Maker and

its subsidiaries, all Senior Debt shall first be paid in full in cash before any payment * * * is made by the Maker in respect of the Junior Debt * * *.

* * *

(f) Each holder of any Senior Debt, whether such Senior Debt was created or acquired before or after the issuance of this Note, shall be entitled to rely on the subordination provisions set forth in this Note * * *. Each of the holders of the Junior Debt agrees * * *.

(Complaint, Ex. 1.)

**{¶43}** Under this same section, "4. Subordination," subsection i. defines the term "Senior Debt." It states:

(i) Definition of Senior Debt. The term "Senior Debt," as used herein, means (i) the Loan and Security Agreement, dated as of December 28, 2017 (as such agreement may be amended, modified, supplemented renewed, extended, restated, or replaced from time to time, the "Loan Agreement") among the Lender (as defined in the Loan Agreement), Maghan Advisors Fergus Capital LLC, as administrative agent for the Lender (in such capacity, the "Agent"), Fergus Capital Auto Receivables I, LLC, as borrower, and Maker, as servicer and originator, (ii) all other agreements, documents and instruments executed and/or delivered in connection with the foregoing, and collectively with the Loan Agreement, the "Senior Debt Documents" and (iii) any guarantee in respect of any Senior Debt, whether for principal or interest, fees or amounts to be reimbursed, including, without limitation, costs of collecting and enforcing the Senior Debt Documents.

(Complaint, Ex. 1.)

**{¶44}** Under section "5. Miscellaneous," subsection (b) states in part:

(b) This Note may be amended, and any provision hereof (including, without limitation, the provisions of Section 4 above) may be waived, but only by agreement in writing, signed by the party against whom any waiver, change or modification or discharges is sought to be enforced; *provided that* this

Case No. 23 MA 0083

Note may not be amended without the consent of the Agent, such consent not to be unreasonably held.

(Emphasis sic.)

**{¶45}** We agree with Appellant's argument that the Amended Note is not ambiguous. The contract here is unambiguous. It defines one Senior Debt. Although general language elsewhere in the Amended Note references "all" senior debt and refers to debt holders in the plural, such that the Amended Note could encompass or include more than one Senior Debt and Junior Debt, the explicit definition of Senior Debt agreed upon by the parties only identifies one Senior Debt.

**{¶46}** The only Senior Debt set forth in the parties' agreement is the December 28, 2017 Loan and Security Agreement between the Lender and Maghan Advisors Fergus Capital LLC, as the agent for the Lender, and Fergus Capital Auto Receivables I, LLC, as borrower, and Maker. The Senior Debt definition states the Senior Debt may include other documents executed in connection with this singular Loan Agreement and guarantees regarding that same agreement. The definition does not, however, include other loans or debts. Neither the definition nor the Amended Note authorizes the parties to add additional senior debts.

**{¶47}** Further, subsection (b) under the miscellaneous heading requires any alterations to the Amended Note to be in writing and signed by the party against whom the change is sought. Neither party introduced evidence of any written alterations of the Amended Note.

**{¶48}** To the extent Appellant contends the definition of Senior Debt authorizes it to be supplemented, we disagree. A plain reading of the language "the Loan and Security Agreement, dated as of December 28, 2017 (*as such agreement* may be amended, modified, supplemented, renewed, extended, restated, or replaced from time to time, the 'Loan Agreement')" confirms it is only the December 28, 2017 agreement that may be amended, supplemented, or replaced. The Amended Note does not permit the addition of additional Senior Debt.

**{¶49}** As for Appellant's claim that Sections 4(c) and (f) authorize or show the parties agreed there could be additional Senior Debt, we disagree. These subsections generally refer to Senior Debt and Junior Debt "holders" in the plural. These provisions

also reference "any" or "all" Senior Debt, which could encompass debt in the plural. However, this language does not show the parties agreed to the addition of other Senior Debt nor does it authorize it. Moreover, Appellant's proposed broad reading of these provisions essentially annuls the definition of Senior Debt, which includes only one loan and any attendant agreements to it.

**{¶50}** Upon construing the agreement as a whole, as required, we conclude the parties' intent was clear. The Amended Note shows they only agreed on the inclusion of one loan as the Senior Debt, as stated in the definition of Senior Debt. *See Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 363, 678 N.E.2d 519 (1997). This interpretation affords meaning and purpose to all parts of the Amended Note. Whereas Appellant's argument eradicates the agreed upon definition of Senior Debt, as well as the requirement that any changes to the Amended Note be in writing. Had the parties intended to allow Appellant to add other loans to constitute Senior Debt, they would have expanded the definition.

**{¶51}** To the extent that Appellant claims the court erred by employing contract interpretation tools in its analysis, we find no error. The trial court relied on the general rule of statutory construction which provides, "the specific mention of one thing [in a statute or contract] implies the exclusion of another." *Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm.*, 28 Ohio St.3d 171, 175, 503 N.E.2d 167 (1986).

**{¶52}** While the doctrine is one generally used when interpreting contractual ambiguities and is a rule of construction, some courts have used the rule when explaining why there is no ambiguity, like here. *See Pierce Point Cinema 10, L.L.C. v. Perin-Tyler Family Found., L.L.C.*, 12th Dist. Clermont No. CA2012-02-014, 2012-Ohio-5008, ¶ 17 (holding that "specific contract provisions take precedence over more general provisions and do not create an ambiguity in a contract"); *but see Arcenio v. Youngstown State Univ.*, 2016-Ohio-4812, 68 N.E.3d 157, ¶ 33-34 (7th Dist.) (stating the canon *expressio unius est exclusio alterius* is to be used where a statutory term is ambiguous and subject to various interpretations). Thus, to the extent the trial court used the rule to find the Amended Note is not ambiguous, we find no error.

**{¶53}** Last, Appellant's final sub-argument claims because the Note expressly authorized it to secure additional Senior Debt, the court's finding Appellant did not act in

Case No. 23 MA 0083

good faith by doing so, is reversible error.  In light of our conclusion that the agreement does not permit Appellant to add additional Senior Debt, its final sub-argument also lacks merit.

**{¶54}** Based on the foregoing, Appellant's first assigned error lacks merit in its entirety.

<u>Second Assignment of Error:  Deposition Testimony Used at Trial</u>

**{¶55}** Appellant's second assigned error asserts:

"The Trial Court erred by admitting the deposition testimony of Mr. Daly as substantive evidence where Plaintiff had not filed the transcript before trial as required, Mr. Daly was not 'unavailable,' and was not listed as a witness or subpoenaed to testify."

**{¶56}** Decisions regarding the admission or exclusion of evidence at trial should not be reversed on appeal absent an abuse of discretion.  *Peters v. Ohio State Lottery Comm.*, 63 Ohio St.3d 296, 299, 587 N.E.2d 290 (1992).  An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶57}** Even if a court abuses its discretion when admitting evidence, an appellate court can only reverse when the error affects a party's substantial right.  *State v. Lundgren*, 73 Ohio St.3d 474, 486, 653 N.E.2D 304 (1995); Evid.R. 103(A); Civ.R. 61.  A reviewing court must weigh the prejudicial effect of any errors and determine whether the trier of fact would have reached the same conclusion without the error.  *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980).  Absent prejudice, the errors or defects are harmless.  Civ.R. 61.

**{¶58}** Here, Appellant challenges the court's decision allowing Appellee to use the deposition of Chris Daly as trial testimony when Appellee failed to comply with Civ.R.32(A) and despite Appellant's objection.  Appellant acknowledges the exception to the rule, i.e., allowing deposition testimony for impeachment purposes.  Civ.R. 32(A).  However, it claims Appellee used Daly's testimony in its case in chief, as well as to impeach.

**{¶59}** Appellant contends the trial court erred as a matter of law by relying on Daly's testimony for its eighth finding of fact, i.e., that Appellant would have defaulted on the Beach Point loan if it had not refinanced.  Appellant generally avers it was prejudiced.

<u>Case No. 23 MA 0083</u>

{¶60} The magistrate' s eighth finding of fact was adopted by the trial court and states: "Defendant did not have sufficient money to pay off the Beach Point loan when it was due, and if Defendant did not extend or refinance the Beach Point loan, Defendant would have defaulted. Defendant was able to extend the due date of the Beach Point loan until December 2017." (February 8, 2023 Judgment.)

{¶61} During his trial testimony, Feaster was asked about Chris Daly's deposition testimony. Feaster agreed Daly testified as the corporate representative.

{¶62} Feaster testified that in addition to his and Daly's initial investments in the company, the company secured a loan from Beach Point with a line of credit at a 12% interest rate. Feaster agreed Appellant obtained an extension to pay off the Beach Point loan. However, Feaster denied the company was at risk of defaulting on the Beach Point loan. Feaster also agreed he was not involved in the day-to-day business, but Daly was. Because Feaster did not know answers to certain questions asked during his deposition, Daly's deposition was also taken. (Tr. 82-83, 86-87.)

{¶63} Feaster acknowledged he sat through the deposition of Daly, but when asked if Feaster remembered Daly's testimony about the Beach Point loan, he said he did not. Thereafter, Appellant's attorney objected because Daly could have been subpoenaed and testified live at trial. In response, counsel for Appellee said he was introducing the testimony as an admission by a party opponent since Daly testified as the corporate representative. The magistrate allowed the questioning, but said she would strike any testimony if it "crosses the line." (Tr. 87-89.) Appellee's counsel then read Daly's deposition, stating:

> Q. I'm going to read this out loud, you read along and you tell me if I read it correctly. * * * * "In any event you did not have, I'm saying, you Fergus Capital, did not have sufficient funds to pay off whatever it was that you owed to Beach Point as of September 1, 2017, correct?" What was Mr. Daly's answer to that?
>
> A. He says correct.
>
> Q. "Question, and that's because [sic] of 2017 Fergus Capital was not a profitable entity, was it?" What's his answer?
>
> A. "No."

\* \* \*

Q. "So if you did not refinance Beach Point Capital debt with Maghan you would have defaulted on it, correct?" What did he say?

\* \* \*

Q. "So to avoid that default you borrowed from Maghan, correct?"

A. He says correct.

(Tr. 89-91.) Feaster then reconfirmed that Daly was the person at the company who knew "all about" the Beach Point loan. Feaster said he had no reason to doubt his testimony in this regard. At this point, Appellant's counsel objected again, and Appellee's counsel stated he was done with this aspect of the questioning. (Tr. 90-91.)

{¶64} The deposition of a corporation's representative during his relationship with the corporation and concerning its business is generally admissible against the corporation and is not hearsay. *Thornton v. Parker*, 100 Ohio App.3d 743, 753, 654 N.E.2d 1282 (10th Dist.1995) (applying Evid.R. 801(D)(2)). However, in *Thornton*, there was no discussion about whether the deposition transcript was filed in advance of trial. *Id.*

{¶65} Civ.R. 32 governs depositions in court proceedings and states in pertinent part:

(A) Use of Depositions. Every deposition intended to be presented as evidence *must be filed* at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing.

At the trial \* \* \*, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any one of the following provisions:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness.

(2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30(B)(5) or Rule 31(A) to testify on behalf of a \* \* \*

> private corporation, partnership or association which is a party may be used by an adverse party for any purpose.

(Emphasis added.)  The filing requirement is mandatory if the deposition will be used as evidence.  *Id.*

**{¶66}**  Yet, a deposition need not be filed pursuant to Civ.R. 32(A) if it is used solely to impeach the witness with his or her prior testimony because the filing requirement in Civ.R. 32(A) only applies when the deposition is "intended to be presented as evidence," not when the deposition is used solely for impeachment purposes.  *Am. Builders & Contrs. Supply Co. v. Frank's Roofing, Inc.*, 2012-Ohio-4661, 979 N.E.2d 15, ¶ 13-14 (3rd Dist.), citing *DuBoe v. Accurate Fabrication,* 10th Dist. No. 98AP-842, 1999 WL 33893941 (July 20, 1999).

**{¶67}**  Here, it seems Appellee used Daly's testimony for impeachment purposes, and as such, the transcript did not have to be filed.  *Id.*  Notwithstanding, consistent with Appellant's argument, the trial court may have relied on the deposition testimony as substantive evidence, in part, for the court's eighth finding of fact.  This finding states: "Defendant did not have sufficient money to pay off the Beach Point loan when it was due, *and if Defendant did not extend or refinance the Beach Point loan, Defendant would have defaulted.*  Defendant was able to extend the due date of the Beach Point loan until December 2017."  (Emphasis added.) (February 8, 2023 Judgment.)

**{¶68}**  Feaster testified at trial that Appellant obtained an extension to repay the Beach Point loan, so the second sentence of the court's eighth finding of fact is properly supported and is of no consequence to this argument.  However, the first sentence of the court's eighth factual finding may rely on Daly's deposition testimony even though it should have been used solely to impeach.  Notwithstanding, Fox also testified that Feaster told him Appellant needed an extension to prevent it from defaulting.  (Tr. 17-23.)

**{¶69}**  Accordingly, to the extent the trial court relied on Daly's testimony for reasons other than impeaching Feaster's testimony, we find error.  However, this finding is also supported by Fox's testimony.  Thus, to the extent the trial court relied on the impeachment evidence for its eighth finding of fact, we find the error, if any, was harmless.  *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980); Civ.R. 61.

**{¶70}** Further, Appellant now claims that Feaster testified in his personal capacity at trial, not as the corporate representative, and as such, Appellant contends his impeachment with the corporation's deposition testimony was improper.

**{¶71}** An objection to the admission of evidence at trial must state the specific ground for the objection, unless it is apparent from the context. Evid.R. 103(A); *In re A.E.*, 8th Dist. Cuyahoga No. 112615, 2023-Ohio-4217, ¶ 29.

**{¶72}** As stated, Appellant's objection was that the deposition transcript was not filed in advance of trial, not that it was impermissible for impeachment purposes since Feaster was testifying in an individual capacity. Appellant did not claim Feaster was testifying in his individual capacity, and not on the company's behalf at trial. Further, this reason for the objection is not apparent from the context. Because Appellant did not raise this aspect of its argument during trial, it is waived on appeal. *State v. Daniels*, 9th Dist. Lorain No. 03CA008261, 2004-Ohio-828, ¶ 33.

**{¶73}** Based on the foregoing, this assigned error lacks merit and is overruled.

<u>Third Assignment of Error: Condition Precedent</u>

**{¶74}** Appellant's third assigned error asserts:

"The Trial Court erred in finding that Defendant Fergus did not meet its burden of proof where Plaintiff Fox presented no evidence to contradict that Defendant Fergus used its best efforts to pay Plaintiff's subordinate debt."

**{¶75}** The trial court found Appellant's repayment of Senior Debt was a condition precedent to the repayment of Fox's loan. The parties do not dispute this finding.

**{¶76}** Appellant argues the court erred by concluding the condition precedent occurred, triggering its obligation to repay Appellee. Appellant also challenges the court's conclusion that it failed to show it used good faith and diligent efforts to pay off the Senior Debt.

**{¶77}** "'A condition precedent is a condition which must be performed before the obligations in the contract become effective.' * * * If a condition precedent is not fulfilled, a party is excused from performing the duty promised under the contract." (Citations omitted.) *Coldwell v. Moore*, 2017-Ohio-526, 85 N.E.3d 262, ¶ 31 (7th Dist.).

**{¶78}** However, "[w]hen one of the parties to a contract has direct influence over the fulfillment of a condition precedent, that party bears 'the burden to show that it made

good faith efforts to satisfy [the] contractual conditions which allegedly excuse its performance.' *Kebe v. Nutro Mach. Corp.* (1985), 30 Ohio App.3d 175, 178." *Johnston v. Cochran*, 10th Dist. Franklin No. 06AP-1065, 2007-Ohio-4408, ¶ 13. A contracting "party cannot take advantage of an unfulfilled condition precedent to excuse its performance without first proving that it exercised good faith and diligence in trying to satisfy the condition." *Id.*

**{¶79}** Relying on the standard of proof for affirmative defenses, the parties tend to agree Appellant had to show its honest and good faith efforts by a preponderance of the evidence. *See Cameron v. Univ. of Toledo*, 2018-Ohio-979, 98 N.E.3d 305, ¶ 18 (10th Dist.), and *Roan v. Hale*, 102 N.E.2d 603, 605, 60 Ohio Law Abs. 559 (2nd Dist.1950). "Preponderance of evidence means the greater weight of evidence. * * * The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium." *Travelers' Insurance Company of Hartford, Conn. v. Gath*, 118 Ohio St. 257, 261, 160 N.E. 710 (1928).

**{¶80}** The party relying on the condition precedent must establish it made honest and reasonable efforts to satisfy the obligation. *Id.* citing *Scelza v. Mikhael,* Summit App. No. 22994, 2007-Ohio-2199, ¶ 10; *Nieman v. Williams*, 10th Dist. Franklin No. 88AP-689 (May 30, 1989).

> Good faith is essentially a weight of the evidence question. The determination of a lack of good faith does not rely solely on actual intent but can involve an inquiry into the party's motive and purpose. *Castle Properties v. Lowe's Home Centers, Inc.* (Mar. 20, 2000), 7th Dist. No. 98CA185. Although good faith generally denotes honesty of purpose and freedom from intention to defraud, the court can consider evidence of what is reasonable in order to evaluate good faith and can evaluate any objective facts that contradict the suggestion of a subjectively honest purpose. *Id.*

*E. Sav. Bank v. Bucci*, 7th Dist. Mahoning No. 08 MA 28, 2008-Ohio-6363, ¶ 85.

**{¶81}** *Black's Law Dictionary* defines "good faith" as: **"**A state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or

business, or (4) absence of intent to defraud or to seek unconscionable advantage." GOOD FAITH, *Black's Law Dictionary* (11th ed. 2019).

**{¶82}** Whether a good faith effort was made to satisfy a condition precedent is usually an issue of fact, especially when the inference of good faith or bad faith could be drawn either way. *Kebe v. Nutro Mach. Corp.*, 30 Ohio App.3d 175, 178, 507 N.E.2d 369 (8th Dist.1985); *Indianapolis v. Domhoff & Joyce Co.*, 69 Ohio App. 109, 119-120, 36 N.E.2d 153 (1941). Appellate courts will not reverse a trial court's factual finding unless it is against the manifest weight of the evidence. *LaFrance v. Ralich*, 7th Dist. Harrison No. 23 HA 0003, 2023-Ohio-4291, ¶ 25.

> [When reviewing] the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the verdict must be reversed and a new trial ordered. * * * In weighing the evidence, we are guided by a presumption that the findings of the trier of fact are correct. * * *

*Loury v. Westside Automotive Group*, 2022-Ohio-3673, 199 N.E.3d 62, ¶ 18 (8th Dist.).

**{¶83}** Appellate courts "should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. * * * The determination of credibility of testimony and evidence must not be encroached upon by a reviewing tribunal * * *." *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984); *accord Andes v. Winland*, 2017-Ohio-766, 85 N.E.3d 1098, ¶ 31 (7th Dist.). Moreover, the credibility of the witnesses is primarily for the finder of fact because the trial judge is best able to view the witnesses and observe their demeanor, including voice inflections and body language. *Seasons Coal Co.*, *supra*, at 80, 461 N.E.2d 1273.

**{¶84}** As stated, the Amended Note states Appellant promised to pay $500,000 "and other amounts described herein" to Appellee on November 12, 2019 "together with all accrued but unpaid interest * * *." The Amended Note also provides in part: "The principal, interest, costs, expenses and any other amounts at any time owed under this

Note (collectively the "Junior Debt") are expressly subordinated in the right of payment to the prior payment in full in cash of all Senior Debt * * *."  (Complaint, Ex. 1.)

**{¶85}**  The parties agreed that Appellant had the burden of proof to show it made good faith and diligent efforts to satisfy the condition precedent, such that its obligation to pay Appellee on November 12, 2019 was not triggered.

**{¶86}**  The court's conclusion that Appellant failed to satisfy its burden of showing good faith and diligent efforts to pay off the Senior Debt is supported by competent and credible evidence.  The trial court found Appellant disregarded its obligation to Fox in an effort to advance its economic interest.

**{¶87}**  First, the trial court found Feaster's testimony lacked credibility for several reasons.  The trial court emphasized that Feaster was unable to provide specific testimony about the amount of debt owed to Maghan or Appellant's ability to pay.  And although Feaster testified that he did not profit from the business, Feaster acknowledged taking an annual salary of $250,000.  Further, Appellant added a second senior debt holder, which was not authorized by the terms of the parties' agreement.  This fact shows it was not acting in good faith.

**{¶88}**  Moreover, Feaster testified the company could have secured the funding necessary to pay off the Fox and Maghan debts, but it did not do so because the terms would have caused the company to incur a financial loss.  Feaster acknowledged the goal of securing better loan terms, which he had not yet obtained, was to ensure the company would be profitable and operate efficiently while also retiring Fox's debt.

**{¶89}**  The foregoing facts support the finding that Appellant did not use honest and reasonable efforts to satisfy its obligation to repay Fox.  The facts also show Appellant disregarded its contractual obligation to Fox in an attempt to further its own financial interest.

**{¶90}**  Finally, although Feaster's testimony may have shown Appellant was diligent in its search for another lender because it contacted more than 100 lenders, the trial court was not obligated to believe his testimony in this regard.  *Rogers v. Hill* (1998), 124 Ohio App.3d 468, 470, 706 N.E.2d 438 (finder of fact is free to believe all, part, or none of the testimony of any witness who appeared before it).

**{¶91}** Accordingly, we cannot conclude the trial court clearly lost its way and created such a manifest miscarriage of justice that the verdict must be reversed and a new trial ordered. This assignment lacks merit.

## Conclusion

**{¶92}** For the reasons stated, Appellant's assignments of error lack merit. The trial court's decision is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**